UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CHICK-FIL-A, INC.,

      Plaintiff,

-vs-                         Case No.    5:07-cv-501-Oc-10GRJ

CFT DEVELOPMENT, LLC, PANDA
RESTAURANT GROUP, INC., and
PANDA EXPRESS,

      Defendants.
_____/

**FINDINGS OF FACT**
**AND**
**CONCLUSIONS OF LAW**

      This is an action to enforce a restrictive covenant in a chain of title to real property. The property involved is located in Mount Dora, Lake County, Florida. The law of Florida supplies the rule of decision and the Court has jurisdiction due to the parties' diversity of citizenship.

      The case was tried without a jury, has been fully briefed, and is ready for decision.

      The Plaintiff, Chick-fil-A, Inc., operates a chain of quick service restaurants specializing in the sale of fried chicken breast sandwiches. The Defendants - - collectively referred to as Panda or Panda Express - - also operate a chain of quick service restaurant establishments specializing in Chinese food consisting of a number of menu items in most of which the primary ingredient is chicken.

The parties own adjacent properties in Mount Dora. Chick-fil-A acquired its site in 2005 and opened a Chick-fil-A restaurant in 2006. Panda Express acquired its site in 2007 with intent to operate one of its restaurants on the premises.[1] At that time, as Panda was aware, Chick-fil-A enjoyed the benefit of a restrictive covenant prohibiting the Panda property from being used as the site of:

> "A quick service restaurant deriving twenty five percent (25%) or more of its gross sales from the sale of chicken."

Panda Express resists the enforcement of this covenant against it on the grounds that: (1) its stores are not "quick service" restaurants as that term is used in the industry and in the covenant; (2) the covenant is void or unenforceable due to vagueness and uncertainty; (3) a typical Panda Express restaurant does not derive 25% or more of its gross sales from the sale of chicken; and (4) Chick-fil-A has waived and/or should be estopped from enforcing the covenant.

With respect to these issues, Panda argues that it is now a part of the evolving "fast casual" segment of the food service industry, not a "quick service" establishment, and should be excluded from the ambit of the covenant by its own terms. The Court finds, however, that at the time of the events involved in this case, according to the understanding of the parties themselves, both were in the business of operating "quick service" restaurants as that term is used in the covenant. Similarly, while the covenant in question might be vague or of doubtful meaning as applied in other

---

[1] The property was actually acquired by the Defendant CFT Developments, LLC, ("CFT") which constructed a building comprised of six retail units or spaces, one of which is intended for lease to Panda Express. The Court issued a preliminary injunction on January 7, 2008, so the proposed lease was not executed, awaiting the outcome of this litigation.

hypothetical contexts, its plain meaning in relation to the facts of this case forecloses the operation of a typical Panda Express restaurant on the site in question, and it was clearly understood in that way by the principals of Panda Express when the property was purchased and they began dealing with Chick-fil-A in an effort to secure a waiver of its restriction. Finally (a) by any reasonable measure, a typical Panda Express restaurant derives 25% or more of its gross sales from the sale of chicken; and (b) other dealings between the parties at different locations concerning the same or similar restrictive covenants do not operate as a waiver by, or estoppel against, Chick-fil-A at this location in Mount Dora.

Thus, upon due consideration of the evidence and the argument of counsel, the Court has concluded, based upon a preponderance of the evidence, and the law of Florida, that the Plaintiff is entitled to a declaratory decree and to enforcement of the covenant through the injunctive relief it seeks; and, in support of that conclusion, the Court now makes the following, more specific - -

## FINDINGS OF FACT

A. The Parties

1. Plaintiff Chick-fil-A, Inc. is a Georgia corporation with its principal place of business at 5200 Buffington Road, Atlanta, Georgia 30349. Chick-fil-A is registered to conduct business in the State of Florida. Chick-fil-A develops and franchises quick-service restaurants throughout the United States specializing in boneless breast of chicken sandwiches and other chicken items.

2.      Defendant CFT Developments, LLC is a California corporation with its principal place of business at 1683 Walnut Grove Avenue, Rosemead, California 91770.  Defendant Panda Restaurant Group, Inc. is a California corporation with its principal place of business at 1683 Walnut Grove Avenue, Rosemead, California 91770.  Panda Restaurant Group is the privately held parent company of Defendant Panda Express, Inc., a California corporation with its principal place of business at 1683 Walnut Grove Avenue, Rosemead, California 91770.  Panda Express operates Panda Express "Chinese" restaurants throughout the United States, including several in Florida, serving predominantly chicken entrees.  The Defendants will be referred to collectively as Panda or Panda Express.

B.      <u>The Mt. Dora Site and the Restrictive Covenant</u>

3.      On or about November 7, 2005, Chick-fil-A acquired fee simple title to property located in Lake County, Florida at 17420 U. S. Highway 441, Mount Dora, Florida 32757 ("Outlot #2").  Chick-fil-A remains the fee simple owner of Outlot #2.

4.      Chick-fil-A purchased Outlot #2 for purposes of constructing a Chick-fil-A restaurant.  A Chick-fil-A restaurant was built on the site and has been in operation since April 20, 2006.  The Mt. Dora Chick-fil-A restaurant is operated by a franchisee.  Chick-fil-A's fees and income from the operation of that restaurant are directly related to its sales.

5.      On or about July 20, 2005 and before Chick-fil-A purchased Outlot #2, Citrus Grove Limited Partnership ("Citrus Grove"), the owner and developer of the property that included Outlot #2, executed a Declaration of Restrictions and

Covenants and caused it to be recorded in the public records of Lake County, Florida on or about October 6, 2005. Chick-fil-A took title subject to and under the protection of the Declaration.

6.     The Declaration establishes restrictions and covenants that govern the use and development of three parcels of land or "Outlots." Outlots #1 and #3 adjoin the Chick-fil-A parcel, Outlot #2. Outlot #1 is currently a Target store.

7.     For the benefit of Outlot #2 the Declaration provides at Paragraph 3.02 (the "Mt. Dora Covenant" or the "Covenant" ) that:

### 3.02   Use Restriction Benefitting Outlot #2

(a)     Outlot #1 and Outlot #3 are prohibited from having any of the following constructed, existing, leased or operated thereon:

  (i)     a quick-service restaurant deriving twenty-five percent (25%) or more of its gross sales from the sale of chicken; or,

  (ii)     any of the following specified establishments: Wendy's, Arby's, Boston Market, Kenny Roger's, Kentucky Fried Chicken, Popeye's, Church's, Bojangle's, Mrs. Winner's, Tanner's, Chicken Out, Willie May's Chicken, Biscuitville, Zaxby's or Ranch One.

(b)     The restrictions in Article 3.02 may be enforced or waived only by the fee simple owner of Outlot #2. The restrictions in this Article 3.02 shall run with the land, burdening Outlot #1 and Outlot #3 and benefitting Outlot #2, and the successors, heirs and assigns thereof.

8.     The Declaration further provides, at Paragraph 4.02, that a violation of the covenant or restriction shall entitle the injured party to a preliminary and permanent injunction and other equitable relief, as well as any remedies available under the laws of Florida.

9.     When it purchased Outlot #2, Chick-fil-A relied upon the Mt. Dora Covenant to protect its legitimate business interests and the value of its investment in that property. The Mt. Dora Covenant was part of the bundle of property rights that Chick-fil-A received in exchange for the purchase price of Outlot #2.

10.     Chick-fil-A negotiated for and included the protections of the Mt. Dora Covenant in its agreement to purchase Outlot #2 because of the potential adverse impact caused by the operation of a prohibited restaurant on Outlot #3 and the difficulty of quantifying the sales that might be diverted from Chick-fil-A by such a restaurant.

C.     The Defendants' Purchase and Intended Use of Outlot #3

11.     Panda acquired actual knowledge of the Mt. Dora Covenant before it purchased Outlot #3. That knowledge was acquired around December 2006 when Panda began considering the purchase of Outlot #3 from A & W Restaurants, Inc.

12.     On or about April 11, 2007, Panda received from its title insurer a commitment listing the Mt. Dora covenant as an "exception" to potential title coverage.

13.     On or about June 21, 2007, Panda purchased Outlot #3 from A & W Restaurants, Inc. pursuant to a Special Warranty Deed that was recorded on July 10, 2007 in the public records of Lake County, Florida. Panda remains the current owner of that property.

14.     In October 2007, Chick-fil-A learned of Panda's plans to construct a Panda Express restaurant on Outlot #3. By letter dated October 29, 2007, Chick-fil-A notified Panda that it believed the planned construction and operation of a Panda

Express restaurant on Outlot #3 would violate the Mt. Dora covenant and that Chick-fil-A intended to enforce all of its rights and remedies.

15.     Panda responded by letter dated November 20, 2007, confirming its intention to lease Outlot #3 for purposes of operating a Panda Express restaurant, but denying any violation of the Mt. Dora Covenant.

16.     Chick-fil-A reiterated in letters to Panda dated November 30, 2007 and December 7, 2007 that the operation of a Panda Express restaurant on Outlot #3 would violate the Mt. Dora Covenant. Chick-fil-A emphasized its intention to enforce its legal rights if Panda did not suspend development and construction of the proposed Panda Express restaurant. Panda refused to do so.

17.     Chick-fil-A then commenced this action on December 12, 2007.

18.     After the Court entered a preliminary injunction on January 7, 2008, Panda constructed a building on Outlot #3 comprised of six separate rental spaces or units, one of which is intended for a Panda Express restaurant. Panda has not proceeded with the Panda Express restaurant, however, due to the injunction and pending the outcome of this litigation.

D.     Nature of Panda Express as a Quick Service Restaurant

19.     Throughout this litigation Panda Express has repeatedly admitted in pleadings, briefs, and affidavits that it operates quick-service Chinese restaurants or "QSR's."

20.     Numerous Panda witnesses testified in depositions that Panda Express operates quick-service restaurants, including: Thomas Davis, PRG's Chief

Executive Officer; David Feng Luo, CFT's Director of Development; David Landsberg, Former Vice President of Business Planning; Frank Miller, Former Vice President of Real Estate; Steve Moukabaa, Former Manager of Financial Planning; Eddie Wang, PRG's Regional Director of Operations.

21.     Panda Express has issued numerous press releases, including one as recently as October 22, 2008, that describe Panda Express restaurants as Chinese "quick service restaurants."

22.     In restaurant industry custom and usage, the term quick-service restaurant is generally understood to mean restaurants that have "counter service," rather than waiter or waitress service, and which serve food that is prepared and paid for in advance. Panda Express is such a restaurant.

23.     At trial, Panda Express offered evidence that at least one major consultant in the food service/restaurant industry now recognizes, as a separate segment of the industry, a category of establishments known as "fast casual restaurants" as distinguished from "quick service restaurants." Fast casual restaurants are said to be typified, among other things, by better quality furnishings than a quick service restaurant; higher total bills for a meal or meals; food designed to appeal to mature customers rather than young adults and children; more beverages, including alcoholic beverages, are usually available; and the menu offerings normally consist of fresh ingredients prepared on the premises often in the view of the customers.

24.     Panda Express thus contends that it is not covered by the terms of the Mt. Dora restrictive covenant because it is a "fast casual" and not a "quick service" restaurant.  The Court finds, however, that the "fast casual" classification of restaurants in the food service industry is an evolving concept of relatively recent origin (the last five years or so); and, at the time of the creation and filing of the Mt. Dora Covenant, as well as the time Panda Express acquired title to Outlot #3, and thereafter up to and beyond the filing of this action, Panda Express was - - and understood itself to be - - a "quick service restaurant" as that term is used in the Covenant.

E.     <u>Panda Express Menu Offerings</u>

25.     Panda Express sells protein-based dishes that it offers as entrees with starch or vegetable-based side orders.

26.     Panda Express offers a "standard" menu comprised of "core" entrees that are (or should be) served at all Panda Express restaurants nationwide. Panda Express intends that each new restaurant use the standard menu.

27.     Panda Express offers a "standard" menu in its nationwide chain of Chinese quick-service restaurants in order to meet customer menu expectations, achieve consistency in service and maintain the integrity of the Panda Express brand. The standard menu also facilitates employee training, promotes operational efficiencies and assists Panda Express in projecting profitability and costs.

28.     Anna Nero, Panda's 30(b)(6) witness regarding Panda Express core menu items and pricing, characterized Panda Express's business as the sale of

entrees. Orange Chicken, the most popular Panda Express entree, constitutes approximately 38 percent of all entre sales. Panda's various chicken entrees as a whole comprise over 70 percent of all Panda Express entree sales.

29.    By representing that several specific Panda Express restaurants with standard menus, including two in Florida, reflect the chicken sales percentage and overall product mix that would be expected at the proposed Mt. Dora restaurant, Panda Express has confirmed its intention to utilize the "standard" Panda Express menu at that restaurant.

30.    Panda Express sells several "combo meals," including a Panda Bowl (one entree and one side), a Two-Item Combo (two entrees and one side), a Three-Item Combo (three entrees and one side), and a Panda Feast. Panda Express also sells entrees and side orders separately a la carte.

31.    Panda's cost of goods is much higher for chicken than it is for side orders, such as rice. For example, in late 2006 when Panda established its current a la carte pricing structure, the cost to Panda of its most popular entree, Orange Chicken, was $1.32 for 16 ounces. In comparison, 16 ounce side orders cost Panda much less: $.35 for vegetable chow mein, $.22 for fried rice and $.08 for steamed rice.

F.    Percentage of Panda Gross Sales Derived from the Sale of Chicken

32.    To aid the Court in determining the percentage of Panda Express gross sales derived from the sale of chicken, each party offered expert testimony. Chick-fil-A offered the testimony of Robert J. Taylor, IV, a certified public accountant.

Panda offered the testimony of an accountant, Robert T. Patterson, and its employees Huntley Castner and Steve Moukabaa.

33.     Mr. Taylor opined that the proposed Mt. Dora Panda Express would derive approximately 34 percent of its gross sales from chicken (assuming "non-chicken ingredients" were excluded or "backed out" of chicken entrees) and approximately 46.3 percent, if not.  If the Covenant were interpreted to mean that "non-chicken ingredients" should be backed out of chicken entree sales, Mr. Taylor opined that the relative cost of the ingredients in chicken entrees (not the relative weight of ingredients) should be the basis for that allocation.  If that were done, Mr. Taylor testified that the percentage of gross sales derived from the sale of chicken would be 34 percent.

34.     In contrast to Mr. Taylor, Mr. Patterson testified that combo meal sales should be allocated to entrees and side orders based upon the relative volume (or weight) in ounces of the servings of entrees and side orders.  The Court finds, however, that the volume allocation methodology completely disregards Panda's actual food costs and the relative a la carte pricing Panda Express established for entrees and side orders, and has no support in the fundamental principles of accounting relative to a determination of "gross sales" which contemplates dollars and cents, not weight or volume.

35.     The Court finds and concludes in fact, therefore, even assuming that non-chicken ingredients should be "backed out" of the determination of "gross sales," the Panda Express standard menu that Panda intends to implement at its

proposed Mt. Dora location would result in more than 25% of the restaurant's gross sales being attributable to the sale of chicken.

36.     This factual conclusion is also supported by Panda's own understanding and belief prior to the commencement of this litigation.  Mr. Landsberg, an officer of Panda, reached that conclusion in October 2004.  Mr. Lopez, Director of Financial Planning, reached that conclusion in February 2005.  Ms. Mamula admitted to Mr. Dominguez in e-mails or letters dated October 29, 2004, December 14, 2004 and February 22, 2005 that Panda Express chicken sales exceed 25 percent.

37.     Similarly, Panda Express represented to the landlord of the Seminole, Florida site that it would change the menu at that restaurant to avoid violating the 25 percent Chick-fil-A restriction, offering further evidence of Panda's understanding that a restaurant using the standard Panda Express menu will derive 25 percent or more of its gross sales from chicken.

G.     The Seminole and Other Sites

38.     Before the events giving rise to this action involving the Mt. Dora site, similar confrontations between these parties occurred at other locations, but none resulted in litigation.  In 2004, for example, in Seminole, Florida, Panda explored - - and ultimately proceeded with - - the opening of a Panda Express restaurant on a site adjacent to a Chick-fil-A restaurant and subject to a restrictive covenant substantially identical to the Mt. Dora covenant involved in this case.  Panda attempted, unsuccessfully, to secure a waiver of the covenant; and, after Chick-fil-A failed to answer two letters from Panda asserting that the covenant was inapplicable

to it, Panda ultimately decided to open the restaurant and circumvent the issue by changing its menu at the Seminole location. No action was ever taken by Chick-fil-A to attempt to enforce the covenant at Seminole.

39. Since the events at Seminole, Panda has opened three other restaurants (one in North Carolina, one in Texas, and one in Clearwater, Florida) in the neighborhood of existing Chick-fil-A restaurants enjoying the benefit of restrictive covenants, two of which are substantially similar to the Mt. Dora Covenant, and Chick-fil-A has not taken legal action to enforce the covenants.

40. The Court does not find as a fact, however, that any of the transactions or events described in paragraphs 38 and/or 39 operate - - or should operate - - to work an estoppel against, or to constitute a waiver of, Chick-fil-A's right to seek enforcement of the Mt. Dora Covenant. Whatever the factual or legal result might be arising out of the events and relationships of the parties at other locations concerning their rights and obligations <u>at those locations</u>, respectively, there is no evidence that would support a finding of waiver or estoppel at the Mt. Dora site. On the contrary, Chick-fil-A consistently refused to waive or bargain away its rights under the Mt. Dora Covenant, and it affirmatively acted in a timely manner to enforce those rights by instituting this litigation.

## **CONCLUSIONS OF LAW**

A.   <u>Jurisdiction, Venue and Choice of Law</u>

41. The Court has personal jurisdiction over the parties and subject matter jurisdiction over the claims for relief in this action.

42.    Venue is proper in the United States District Court, Middle District of Florida, Ocala Division.

43.    The legal issues raised in this action regarding the enforceability of the Mt. Dora Covenant, the availability of injunctive and declaratory relief, and the substantive issues raised by the parties' pleadings are governed by the substantive laws of the State of Florida.

44.    All procedural and evidentiary issues raised in this action are governed by Federal Rules of Civil Procedure and the Federal Rules of Evidence.

45.    To bring a declaratory judgment action, there must be a bona fide dispute between parties and an actual, present need for a declaration. Britamco Underwriters, Inc. v. Central Jersey Investments, Inc., 632 So. 2d 138, 139 (Fla. 4th DCA 1994). Such a dispute exists in this case.

B.    Defendants have Judicially Admitted that Panda Express is a QSR

46.    Judicial admissions are considered procedural in nature, and thus are governed in federal court by the Federal Rules of Evidence. American Title Ins. Co. v. Lacelaw Corp., 861 F. 2d 224, 226 (9th Cir. 1988).

47.    "[A]dmissions in pleadings[s] are deemed judicial admission[s], binding on the party who makes them." Lofton v. Kearney, 157 F. Supp. 2d 1372, 1375 n. 3 (S.D. Fla. 2001) (fact in answer had effect of judicial admission) (citing Missouri Hous. Dev. Comm'n v. Brice, 919 F. 2d 1306, 1314 (8th Cir. 1990)); Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc., 780 F. 2d 549, 550-51 (6th Cir. 1986); see also Continental Ins. Co. of N.Y. v. Sherman, 439 F. 2d 1294,

1298 (5th Cir. 1971) ("the pleading of a party made in another . . . or the same action are admissible as admissions of the pleading party to the facts alleged therein.").

48. Defendants' Answer (Doc. 32) ¶ 4, dated January 2, 2008; Defendants' Counterclaim (Doc. 31) ¶ 8, dated January 9, 2008; and Defendants' Amended Counterclaim (Doc. 60) ¶ 8, dated November 26, 2008; all contain judicial admissions that Panda Express restaurants are "quick-service restaurants." That admission, together with the Court's Findings of Fact, establish conclusively that the proposed Mt. Dora Panda Express would be a "quick service restaurant" within the meaning of the Mt. Dora Covenant.

C.    Florida Law Recognizes the Validity and Enforceability of Restrictive Covenants that Run with the Land

49. As this Court recognized in entering a preliminary injunction, property owners have certain rights under Florida law to impose covenants that run with the land and create restrictions on the use of property. See Fiore v. Hilliker, 993 So. 2d 1050, 1053 (Fla. 2d DCA 2008); Hagan v. Sabal Palms, Inc., 186 So. 2d 302, 307 (Fla. 2d DCA 1966).

50. This Court is guided by a long series of Florida cases addressing restrictive covenants in the context of real estate. "While covenants that run with the land must be strictly construed in favor of the free and unrestricted use of real property, a restriction which sufficiently evidences the intent of the parties and which is unambiguous will be enforced according to its terms." Eckerd Corp. v. Corners Group, Inc., 786 So. 2d 588, 590-91 (Fla. 5th DCA 2000). As in the case of contract construction generally, a restrictive covenant is not ambiguous unless it is susceptible

to more than one reasonable interpretation. Restrictive covenants "should never be construed in a manner which would defeat the plain and obvious purpose and intent of the restriction." 786 So.2d at 591. Thus, a term or provision in a covenant that might be of doubtful meaning in other contexts or other hypothetical factual situations will not defeat application of the covenant where it is clear, under the facts at hand, that the covenant was intended to apply to those facts and was so understood by the parties. See Triple Development Co. v. Floridagold Citrus Corp., 51 So. 2d 435, 439 (Fla. 1951); Multitech Corp. V. St. Johns Bluff Investment Corp., 518 So. 2d 427, 430 (Fla. 1st DCA 1988). See also State v. Brake, 796 So. 2d 522, 526 (Fla. 2001). Such is the case here.

51. Restrictive covenants are common in the context of developments such as shopping centers and are aids to attracting and ensuring the financial success of businesses which lease or purchase properties in such developments. See Winn-Dixie Stores, Inc. v. Dolgencorp, 964 So. 2d 261, 263 (Fla. 4th DCA 2007). Restrictive covenants are common in the restaurant industry, as demonstrated by the fact that Panda Express, Chick-fil-A and numerous other restaurants routinely include covenants in shopping center leases and purchase agreements that restrict the construction and operation of other restaurants whose operation is perceived to be potentially detrimental to the restaurant benefitted by the covenant.

52. The restrictions and covenants created by the Mt. Dora Covenant run with the land as a burden upon each outlot and for the benefit of the fee simple

owner of Outlot #2.  Under Florida law, therefore, Chick-fil-A is entitled to the full protection afforded by the Mt. Dora Covenant.

      D.   <u>No Waiver</u>

      53.    To establish waiver under Florida law, a party must prove that:  (1) there was the existence of a right at the time of the waiver; (2) there was actual or constructive knowledge of the right; and (3) there was an intention to relinquish the right.  <u>Kirschner v. Baldwin</u>, 988 So.2d 1138, 1142 (Fla. 5th DCA 2008); <u>Mizell v. Deal</u>, 654 So. 2d 659, 663 (Fla. 5th DCA 1995).

      54.    The Declaration states in Paragraph 4.01 that it can be amended or waived only in a writing signed by all persons having rights thereunder.  There is no evidence of such a written amendment or waiver of the Mt. Dora Covenant.  Nor is there any other evidence that Chick-fil-A intended to relinquish or did relinquish its rights under the Mt. Dora Covenant either orally or in writing, or otherwise through behavior.  Accordingly, Panda has not shown that Chick-fil-A waived the enforcement of the Mt. Dora Covenant.

      E.   <u>No Estoppel</u>

      55.    To prove estoppel under Florida law a party must show: (1) a representation by the party to be estopped made to the party claiming estoppel as to some material fact which is contrary to the position later asserted by the estopped party; (2) a reasonable reliance on the representation by the party claiming estoppel; and (3) a detrimental change in position by the party claiming estoppel caused by the

representation and the reliance on it.  <u>Mobile Med. Indus. v. Quinn</u>, 985 So. 2d 33, 35-36 (Fla. 1st DCA 2008).

56.　Panda has not shown that Chick-fil-A made any "representation" that would estop it from enforcing the Mt. Dora Covenant.

57.　Any inaction by Chick-fil-A or non-enforcement of restrictive covenants other than the Mt. Dora Covenant is insufficient to establish an estoppel to enforce <u>that</u> covenant.  While silence or inaction may form the basis of an estoppel where there is a duty to speak out or take some action, <u>see</u> <u>Travelers Ins. Co. v. Spencer</u>, 397 So. 2d 358, 361 (Fla. 1st DCA 1981); <u>Pasco County v. Tampa Dev. Corp.</u>, 364 So. 2d 850 (Fla. 2d DCA 1978), Chick-fil-A was not silent or inactive in respect to the Mt. Dora Covenant.  In purchasing the Mt. Dora Outlot #3 Panda did not reasonably rely on any silence or inaction of Chick-fil-A.

58.　Accordingly, Chick-fil-A is not estopped from enforcing the Mt. Dora Covenant.

> F.　<u>The Mt. Dora Covenant is Unambiguous, Valid, and Enforceable Against the Defendants</u>

59.　Whether Chick-fil-A and Panda Express are "direct" or "indirect" competitors because of any difference in cuisine or style of preparing chicken is immaterial to the enforceability of the Mt. Dora Covenant.  Paragraph 3.02(a)(i) plainly and simply prohibits any quick-service restaurant that derives 25 percent or more of its gross sales from the sale of chicken.  The relevant issue is chicken sales.

60. The term "gross sales" is unambiguous and its meaning is free from doubt as used in the Mt. Dora Covenant. "Gross sales" means the total sales in dollars generated by a restaurant on Outlot #3.

61. The term "its" is unambiguous and free from doubt as used in the Mt. Dora Covenant. The relevant restaurant for purposes of this case is the proposed Mt. Dora Panda Express.

62. The Mt. Dora Covenant is not ambiguous or of doubtful meaning simply because it does not prescribe a period of time for calculating gross sales. The Court construes the covenant to require a reasonable or representative time period for calculating the percentage of gross sales derived from the sale of chicken. De Cespedes v. Bolanos, et al., 711 So. 2d 216, 218 (Fla. 3d DCA 1998) ("The general Florida rule is that when a contract does not expressly fix the time period for performance of terms, the law will imply a *reasonable time*.") (emphasis added).

63. The phrase derived "from the sale of chicken" is unambiguous and free from doubt as used in the Mt. Dora Covenant. As applied to this case, chicken simply means chicken, as listed on Panda Express's menu. As applied to the facts of this case, the Court interprets the Covenant to mean that all sales derived from chicken entrees are derived "from the sale of chicken." Such is the plain, common sense meaning of the language. It would be unreasonable to construe the Covenant to require that some percentage of chicken entree sales be excluded or "backed out" to account for "non-chicken ingredients," such as sauces, spices or breading, when calculating Panda's percentage of gross sales derived from the sale of chicken.

Nevertheless, even if any revenue attributable to non-chicken ingredients is deducted or "backed out" of the calculation of gross sales in this instance, the Panda Express standard menu that Panda intends to implement in Mt. Dora would result in more than 25% of the restaurant's gross sales being attributable to chicken. (See paragraphs 33 - 37, supra.)

64.     Because Panda has judicially admitted that Panda Express is a quick-service restaurant, the Court need not consider extrinsic evidence to determine the meaning of that term as used in the Mt. Dora Covenant. Assuming extrinsic evidence were appropriately considered for that purpose, however, the Court concludes that the Mt. Dora Covenant invokes the term "quick-service restaurant" as commonly understood and used in the restaurant industry; and; based on the Findings of Fact at Paragraphs 19-24, supra, the Court now concludes as a matter of law that the proposed Mt. Dora Panda Express would be a quick-service restaurant within the meaning of the Mt. Dora Covenant.

65.     The Court concludes that the Mt. Dora Covenant is valid, applies to, and is enforceable against Panda Express restaurants and the Defendants.

G.     Declaratory Judgment

66.     Having concluded that the Mt. Dora Covenant is valid and enforceable, that Panda Express restaurants are quick-service restaurants within the meaning of the Covenant, and that the proposed Panda Express restaurant would derive 25 percent or more of its gross sales from the sale of chicken, Chick-fil-A is entitled to the declaratory judgment it has requested. The Court declares that the Mt.

20

Dora Covenant precludes the construction, leasing or operation of a Panda Express restaurant on Outlot #3. (See paragraph 73, <u>infra</u>.). The declaratory relief requested by the Defendants in their Amended counterclaim is denied.

H.   <u>Permanent Injunction</u>

67.   Under Florida law, where a party seeks an injunction to prevent the violation of a restrictive covenant, the party need not allege or show irreparable injury. "Appropriate allegations showing the violation are sufficient and . . . [the] violation [itself] amounts to irreparable injury." <u>Jack Eckerd Corp. v. 17070 Collins Avenue Shopping Center, LTD</u>, 563 So.2d 103, 105 (Fla. 3d DCA 1990) (citing <u>Stephl v. Moore</u>, 114 So. 455 (Fla. 1927)). Florida courts have held that the rule excusing proof of irreparable harm also avoids the need for the party seeking to enforce a restrictive covenant to demonstrate the absence of an adequate remedy at law. <u>See</u> <u>AutoZone Stores, Inc. v. Northeast Plaza Venture, LLC</u>, 934 So 2d 670, 673 (Fla. 2d DCA 2006); <u>Daniel v. May</u> 143 So. 2d 536, 538 (Fla. 2d DCA 1962).

68.   Chick-fil-A has appropriately alleged and proved that the proposed Panda Express restaurant would violate the Mt. Dora Covenant. Therefore, Chick-fil-A need not provide independent proof of irreparable harm and the absence of a remedy at law. <u>Daniel</u>, 143 So. 2d at 538.

69.   This Court also concludes that the threatened injury to Chick-fil-A, including the violation of its property rights and potential loss of sales, outweighs whatever damage a permanent injunction may cause to Panda Express. This conclusion is also reinforced by the fact that Panda understood and believed as early

as 2004 that Panda Express restaurants derive more than 25 percent of their sales from chicken and that Panda had actual knowledge of the Mt. Dora Covenant before purchasing Outlot #3. Nevertheless, the Defendants proceeded with plans to acquire Outlot #3 for purposes, among others, of constructing a Panda Express. Whatever hardship may accrue to Defendants by virtue of a permanent injunction could easily have been avoided. In addition CFT may lease the units in the building constructed on Outlot #3 to other retailers and mitigate any financial hardship.

70.     Restrictive covenants serve a valid public purpose by enabling purchasers of property to control the development and use of property and to protect property owners' interest in land. Wood v. Dozier, 464 So. 2d 1168, 1170 (Fla. 1985). Therefore a permanent injunction in favor of Chick-fil-A would not be contrary to the public interest.

71.     Chick-fil-A's claim for permanent injunction is ripe for adjudication. Chick-fil-A is not required to wait for the actual violation of the Mt. Dora Covenant before seeking the aid of the courts. See Bolen Intern., Inc. v. Medow, 191 So. 2d 51, 53 (Fla. 3d DCA 1966).

72.     This Court concludes, as a matter of fact and law, that Chick-fil-A is entitled to and is hereby awarded an injunction, making permanent the preliminary injunction entered on January 7, 2008.

73.     Given the Court's conclusion (paragraph 63, supra) that in calculating Panda's gross sales in dollars derived from the sale of chicken, the proceeds from the sale of any chicken entree should be treated as so derived without

deducting or "backing out" any portion of the sale as attributable to other ingredients such as starches, spices or breading, it would not seem probable - - or even possible - - that Panda Express could (or would) alter its menu offerings in such a way as to comply with the 25% restriction as so construed without a drastic, fundamental departure from its standard or core menu featuring chicken. The injunction, therefore, as did the Preliminary Injunction, will simply prohibit the operation of a Panda Express restaurant on Outlot # 3. If Panda Express desires to open and operate a restaurant at that location not involving the sale of chicken in a manner that would violate the Mt. Dora Covenant as construed by the Court, it may always apply for an amendment of the injunction.

74.     A separate Final Judgment will be entered granting Chick-fil-A's request for declaratory judgment, issuing a permanent injunction and denying the Defendants' Counterclaim. Chick-fil-A may seek the assessment of costs according to law.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this 3rd day of September, 2009.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya McSheehy